UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES

v.

GLENN A. CHIN

AMENDED ORDER ON MOTION OF TRUSTEES
OF BOSTON UNIVERSITY TO UNSEAL
JUROR NAMES AND ADDRESSES

November 17, 2017

STEARNS, D.J.

On October 18, 2017, the Trustees of Boston University filed a motion to intervene in this case seeking to obtain the names and home addresses of citizen jurors who were called to service in the trial of *United States v. Glenn Chin*. The court denied the motion to unseal juror names and home addresses absent a protective order designed to guard against unnecessary dissemination of the jurors' personal information, including over the Internet, and noted that in any event, it would not disclose jurors' home addresses. *See* Dkt #1281 (Oct. 27, 2017). In its preliminary Order, the court referenced Judge Young's similar ruling in *United States v. Wright*, No. 15-cr-10153 (Dkt #357). Judge Young, however, in a subsequent electronic order, reconsidered his position regarding a protective order and ordered the

immediate release of jurors' names and home cities/towns (but not home addresses), although adding that "absent a juror's express agreement, no additional personal identifiers about that juror shall be published." *See Wright*, Dkt #394.

Given Judge Young's change in position, the court on further reflection agrees with his implicit finding that the requirement of a protective order is impractical, and perhaps unconstitutional, and amends its previous order, Dkt #1281, as follows: "Upon sentencing, the court will release a list of the Chin jurors' names and home towns." However, the court will not release jurors' home addresses. To explain why the court believes this result to be the correct balance of the constitutional issues at stake, and why non-disclosure of jurors' home addresses is required to safeguard the important role that juries play in our legal system and constitutional order, the court offers the following historical perspective.

## COMMON-LAW ORIGINS AND FIRST PRINCIPLES

It is not hyperbolic to describe the jury as "the single most important institution in the history of Anglo-American law." LAURENCE TRIBE, CONSTITUTIONAL LAW 618 (3d ed. 2000) (quoting Morris Arnold, *The Civil Jury in Historical Perspective, in* THE AMERICAN CIVIL JURY 9-10 (1987)). Although "[f]ew subjects have exercised the ingenuity and baffled the

research of the historian more than the origin of the jury," WILLIAM FORSYTH, HISTORY OF TRIAL BY JURY 2 (1852), one can detect echoes of the jury right in Magna Carta, which formally proclaimed that: "No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land." Magna Carta, cl. 39. Sir William Blackstone concluded that the jury right recognized in Magna Carta was "more than once insisted on as the principal bulwark of our liberties." 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *351 (Claitor's ed., Baton Rouge, LA 1976) (BLACKSTONE, COMMENTARIES).

In fact, the origins of community judgment and punishment for alleged crimes, as an alternative to the fiat of the Crown, predate Magna Carta.[1]  As Blackstone observed, "[s]ome authors have endeavored to trace the origin[] of juries up as high as the Britons themselves, the first inhabitants of our island; but certain it is that they were in use among the earliest Saxon colonies . . . ." 3 BLACKSTONE, COMMENTARIES *349.  Variations of the jury trial

---

[1] The most reliable common-law evidence traces to the reign of King Henry II and the proclamation in 1166 of the Assize of Clarendon. *See* Thomas J. McSweeney, *Magna Carta and the Right to Trial by Jury*, *in* MAGNA CARTA: MUSE & MENTOR 142 (Randy J. Holland ed., 2014).

and the concept of collective judgment and punishment make their appearance in antiquity: the Roman system of *lex acilia*[2] provided for the empaneling of a group of nobles to gauge the guilt or innocence of provincial officeholders accused of misconduct; Socrates chose hemlock over challenging or defying a verdict that had been delivered by a 500-person Athenian jury, even when presented with an eleventh-hour opportunity for escape.

Whatever its precise origins, the jury trial was a staple of the common law, designed to foster local dispute settlement and hold individuals accountable for crimes in a way that fostered effective regional governance and conserved the Crown's judicial resources, while eventually coming to offer protections to the rights of the accused. Early commentaries on English law reflect the priority placed on having juries drawn from the *vicinage* — the area or county in which the alleged crime had been committed. Jurors were "to be of the Neighbourhood of the Fact to be inquired, or at least of the County or Bailywick." SIR MATTHEW HALE, HISTORY OF THE COMMON LAW OF ENGLAND 160 (Charles M. Gray ed., 1971). Chief Justice Coke's treatise on English law emphasized this *vicinage* requirement. *See* 3 EDWARD COKE,

---

[2] *See generally* Anton-Hermann Chroust & John Richard Murphy, *Lex Acilia and the Rise of Trial by Jury in the Roman World*, 24 NOTRE DAME L. REV. 1 (1948).

FIRST INSTITUTE OF THE LAWS OF ENGLAND 368-369 (2d Am. ed. 1836) ("[E]very trial shall be out of that town, parish, or hamlet, or place known out of the town, &c., within the record, within which the matter of fact issuable is alleged, which is most certain and nearest thereunto, the inhabitants whereof may have the better . . . knowledge of the fact."). As Coke's formulation indicates, early English juries were expected to have direct familiarity with the facts and individuals involved in the case and thus "functioned more as witnesses than as triers of fact." Douglas Smith, *The Historical and Constitutional Contexts of Jury Reform*, 25 HOSFTRA L. REV. 377, 392 (1996) (Smith, *Jury Reform*).

In the early period of the European settlement of North America and in the decades that immediately preceded the American Revolution, juries featured prominently in disputes, both criminal and civil, in courts throughout the colonies. An early statute of the Plymouth Colony in 1623 "declared that 'all criminal facts . . . should [be tried] by the verdict of twelve Honest men to be Impanelled by Authority in forme of a jury upon their oaths.'" Albert Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. CHICAGO L. REV. 867, 903 n.187 (1994). Similarly, "James I's Charter to the Virginia Company in 1606 promised the colonists who would settle Jamestown a year later that they would enjoy all

the rights of Englishmen, including the right to a jury trial." *Id.* at 870 n.15. These early inducements to would-be settlers quickly translated into codified rights guaranteed by the colonial constitutions, charters, and common laws. The Colony of West New Jersey adopted trial by jury in 1677, with Pennsylvania following five years later. *See* Smith, *Jury Reform* at 422 n.174. "Rhode Island adopted trial by jury in 1647; South Carolina adopted it in 1712: and Delaware adopted the language of the Magna Carta in 1727." *Id.* (citing 1 J. KENDALL, IN DEFENSE OF TRIAL BY JURY 36 (1993)).

Colonial American juries wielded far more power than either their English antecedents or their modern counterparts, chiefly because they often took it upon themselves to decide *both* questions of law and fact.[3] "Whereas modern juries must follow the law as stated to them by the court, juries in prerevolutionary Massachusetts could ignore judges' instructions on the law

---

[3] This practice was in direct contrast to the distribution of labor that obtained in English courts, where juries generally possessed power to resolve only questions of fact, while the judges decided questions of law. *See, e.g.,* 3 BLACKSTONE, COMMENTARIES *380 (noting that though juries are "the best investigators of truth," they should be prohibited from making rulings of law, since "if the power of judicature were placed at random in the hands of the multitude, their decisions would be wild and capricious, and a new rule of action would be every day established in our courts"); COKE, FIRST INSTITUTE § 234 at 155(b) ("*Ad questionem facti non respondent judices . . . ad questionem juris non respondent juratores.*").

and decide the law by themselves in both civil and criminal cases." WILLIAM E. NELSON, AMERICANIZATION OF THE COMMON LAW: THE IMPACT OF LEGAL CHANGE ON MASSACHUSETTS SOCIETY, 1760-1830, 3 (Harvard Univ. Press, 1975). This power was ceded to juries "apparently so that they could serve when needed as a restraint on judicial power" in the colonies, *id.* at 28, a practice and custom endorsed by leading jurists of the founding generation. *See, e.g.,* 1 LEGAL PAPERS OF JOHN ADAMS 230 (Wroth & Zobel eds., Belknap 1965) (concluding that it was "an Absurdity to suppose that the Law would oblige [the jury] to find a Verdict according to the Direction of the Court, against their own Opinion, Judgment and Conscience."); THOMAS JEFFERSON, NOTES ON THE STATE OF VIRGINIA 140 (J.W. Randolph ed., 1853) ("[I]f the question relate to any point of public liberty, or if it be one of those in which the judges may be suspected of bias, the jury undertake to decide both fact and law.").[4] While the grant of law-finding power to the jury has long since been extinguished by the Supreme Court, *see Sparf v. United States*, 156 U.S. 51 (1895)[5], the early practice reinforces the point that "[t]he authors known

---

[4] Adams and Jefferson were essentially echoing Chief Justice Coke's famous dictum in *Dr. Bonham's Case*, 77 Eng. Rep. 644 (1610), that if an act of Parliament "is against Common Right and Reason . . . the Common Law will control it, and adjudge such Act to be Void."

[5] The movement toward a firm bifurcation of the law- and fact-finding functions between judge and jury began (at least in the United States) in the

to the founders had a high respect for the wide powers of the jury over law, fact and punishment . . . . In a sense, the jury was, and remains, the direct voice of the sovereign, in a collaborative effort with the judge." *United States v. Khan*, 325 F. Supp. 2d 218, 229-230 (E.D.N.Y. 2004) (Weinstein, J.).

Concerns over the preservation of the jury right in the face of British encroachment provided kindling for the Revolution. Among the Resolutions adopted by the 1765 Stamp Act Congress was "[t]hat trial by jury is the inherent and invaluable right of every British subject in these colonies." Resolutions of the Stamp Act Congress, 1765 ¶ VII. As disputes between the colonials and the Crown simmered, Parliament "responded to their difficulties with American juries partly by extending the jurisdiction of admiralty courts, a jurisdiction that before 1767 had been limited to maritime

---

late eighteenth and early nineteenth centuries, well before the Supreme Court definitely resolved the issue in *Sparf.* For example, in one of the handful of original jury trials performed by the Supreme Court, Chief Justice John Jay's instructions to the jury noted that "it is presumed that juries are the best judges of the facts; it is, on the other hand, presumable that the court are the best judges of the law," while also adding that "both objects are lawfully, within your [the jury's] power of decision." *State of Georgia v. Brailsford*, 3 U.S. 1, 4 (1794). Justice Story, sitting as a trial judge in *United States v. Battiste*, concluded that "I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court." 24 F. Cas. 1042, 1043 (C.C.D. Mass. 1835).

cases," and "permitted some English officials charged with crimes to be tried in England rather than America."  Alschuler & Deiss, *A Brief History of the Criminal Jury* at 875.  The First Continental Congress listed the deprivation of "the benefits of trial by Jury" when enumerating grievances against King George III in its 1774 Declaration of Rights.  The 1776 Declaration of Independence iterated that grievance, condemning the King "[f]or depriving us in many cases, of the benefit of Trial by Jury."  THE DECLARATION OF INDEPENDENCE para. 20 (U.S. 1776).

At the time of Independence, "[t]he constitutions adopted by the original States guaranteed jury trial," and "the constitution of every State entering the Union thereafter in one form or another protected the right to jury trial in criminal cases."  *Duncan v. Lousiana*, 391 U.S. 145, 153 (1968).  To take a local example, Article XII of the Massachusetts Constitution, drafted by John Adams, provided that "no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land."  Article XII further prohibited the legislature from making "any law" that would "subject any person to a capital or infamous punishment . . . without trial by jury," while Article XIII protected the *vicinage* rights of both the defendant and the

community: "In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen." MASS. CONST. art. XII-XIII (1780).

Debates over the ratification of the U.S. Constitution reflect the central position occupied by the jury in the structure of American government. In the Federalist Papers, Alexander Hamilton wrote that "[t]he friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government." THE FEDERALIST No. 83. Among the criticisms of the new Constitution advanced by the anti-federalists, a chief concern was their belief that it provided *insufficient* protections for the jury right. *See* HERBERT J. STORING, WHAT THE ANTI-FEDERALISTS WERE FOR 19 (1981) ("The question was not fundamentally whether the lack of adequate provision for jury trial would weaken a traditional bulwark of individual rights (although that was also involved) but whether it would fatally weaken the role of the people in the administration of government.").

The most prominent of the Anti-Federalists, the pseudonymous Federal Farmer, noted that through juries "frequently drawn from the body

of the people . . . and by holding a jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful control in the judicial department." *Letters from the Federal Farmer* (XV), in 2 THE COMPLETE ANTI-FEDERALIST 320 (Jan. 18, 1788) (H. Storing ed., 1981). While the anti-federalists did not prevail in their efforts to block ratification of the Constitution, their concerns animated the creation of the Bill of Rights. *See* Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 YALE L.J. 1131, 1183 (1991) (noting that "the entire debate at the Philadelphia convention over whether to add a Bill of Rights was triggered when George Mason picked up a casual comment from another delegate that 'no provision was yet made [in the constitution] for juries in civil cases'" and observing that "[g]uaranteed in no less than three Amendments, juries were at the heart of the Bill of Rights."). The jury, in other words, "summed up – indeed embodied – the ideals of populism, federalism, and civic virtue that were the essence of the original Bill of Rights." *Id.* at 1190.

## THE JURY AND REPUBLICAN GOVERNMENT

It is essential to note that there are two values safeguarded by the right to a jury trial, particularly in criminal cases. The first, and most obvious, is that the right to be tried before a jury of one's peers is a personal right that belongs to the accused. Called to answer for alleged crimes, the defendant

has the right to have a jury assembled to decide his fate, often in colonial days with the hangman's noose looming, as most felonies then were punishable by death.  So it is said in the Sixth Amendment that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. CONST. amend. VI.

The second value, and the one directly implicated in this case, is that the protection of the jury trial right in the Constitution is structural, and is meant to preserve popular sovereignty and republican government.  The enabling of citizens to participate directly in government as jurors adjudicating crimes and civil claims is "one of the forms of sovereignty of the people."  ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 270 (J.P. Mayer ed. 1969) (TOCQUEVILLE).  Jurors do not merely render verdicts; they also "represent the voice of the people, for they [are] closely tied to local communities." NELSON, AMERICANIZATION OF THE COMMON LAW 21.  In addition to providing a defendant with "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge," there is "a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges" and a "[f]ear of unchecked power" that "found expression in the criminal law in this

insistence upon community participation in the determination of guilt or innocence." *Duncan*, 391 U.S. at 156.

While in a criminal case it is a defendant's life and liberty that is directly at stake, "[t]rials [are] not just about the rights of the defendant but also about the rights of the community. The people themselves [have] a right to serve on the jury — to govern through the jury." AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 237 (2005). This view of the jury was most vividly expressed by Tocqueville, who wrote that "[o]ne must make a distinction between the jury as a judicial institution and a political one," because "great though its influence on the outcome of lawsuits is, its influence on the fate of society itself is much greater still." TOCQUEVILLE at 270, 272. While Tocqueville could not say "whether a jury is useful to the litigants," he was "sure it is very good for those who have to decide the case." *Id.* at 275. Justice Story, in describing the jury trial right, similarly argued that it was designed "to guard against a spirit of oppression and tyranny on the part of rulers, and against a spirit of violence and vindictiveness on the part of the people." JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1774 at 653 (Rothman ed. 1991). Story added that so long as "this palladium remains sacred and inviolable, the liberties of a free government cannot wholly fall," *id.*, and concluded on a somewhat elitist

note that to give the jury trial "real efficiency, it must be preserved in its purity and dignity; and not, with a view to slight inconveniences, or imaginary burthens, be put into the hands of those, who are incapable of estimating its worth, or are too inert, or too ignorance, or too imbecile, to wield its potent armour." *Id.* § 1774 at 653-654.

The collective or community right that inhered in the Constitution's protection of the jury trial has an ancillary benefit – one that might be called "democratic vocationalism" – that jury service became (and is today) something of a cram course in American government. Although focused on rendering a just verdict, "the jury [is] in part an intermediate association designed to educate and socialize its members into virtuous thinking and conduct" in an effort to "instill[] republican legal and political virtues." Amar, *Bill of Rights as a Constitution* at 1186. After all, "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers v. Ohio*, 499 U.S. 400, 407 (1991). Again, in Tocqueville's eloquent words, "[t]he jury is both the most effective way of establishing the people's rule and the most efficient way of teaching them how to rule." TOCQUEVILLE at 276.

## JUROR PRIVACY AND THE FREEDOM OF THE PRESS

With this introductory preface, I reach the issue at hand, that of juror privacy. Central to this consideration is the sacrosanctity of the jury's deliberations. As Nancy Gertner, a former colleague and now Harvard lecturer, has written, "[e]ven though the rights of the accused might be non-existent once the jury has reached a verdict, failure to maintain jury secrecy post verdict might 'chill' deliberations in the future, a result that would undermine the Sixth Amendment rights of others." NANCY GERTNER & JUDITH MIZNER, THE LAW OF JURIES §10.7 at 261 (citing *United States v. Doherty*, 675 F. Supp. 719 (D. Mass. 1987)). Thus, while the Sixth Amendment interest of the accused may be extinguished by a verdict, the community's right to participate in effective judicial governance endures. As Gertner notes, "additional questions arise with respect to the institutional interest in preserving the secrecy of deliberations and to a degree, the jurors' interests in the privacy of their decision making" – thus deliberations among jurors, "unlike the rest of the trial, are or should be, shielded from public view." GERTNER & MIZNER, LAW OF JURIES § 10.1 at 250.

On the other hand, the public's interest in participating in judicial decision-making and community judgment, in almost all cases, is augmented, not compromised, by the public character of the American trial

and by the First Amendment right of the press to report on court proceedings.  Public access to the courts serves important societal values: "assuring that proceedings are conducted fairly; discouraging perjury, misconduct of participants, and biased decisions; prophylaxis as an outlet for community hostility and emotion; ensuring public confidence in a trial's results through the appearance of fairness; inspiring confidence in judicial proceedings through education regarding the methods of government and judicial remedies." *In re Globe Newspaper Co.*, 920 F.2d 88, 94 (1st Cir. 1990) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570-571 (1980)).  Although "juror names and addresses are collateral information kept by the court for its necessary administrative purposes, rather than being court proceedings or records of such proceedings," *In Re Newspaper Co.*, 920 F.2d at 94, there is a strong argument, I acknowledge, that juror names should be made publicly available in the interests of transparency.

In *re Globe,* the Court of Appeals addressed a district court's refusal to release a juror list because the jurors "explicitly expressed a desire that their names and addresses not be revealed to the press," *id.* at 90 n.1 (quoting the district court's order).  The First Circuit rejected this rationale as insufficient to justify the impoundment of jurors' names, noting that the district court pointed "to no special reasons for confidentiality other than the personal

preferences of the jurors and the judge's distaste for exposing them to press interviews." *Id.* at 91. Two observations about *In Re Globe*: First, the case concerned a refusal of a district judge to turn over juror *names*; the mention of addresses or other personal identifying information of jurors was relegated to *dicta* in a footnote. *See id.* at 93 n.6 ("We think, therefore, that addresses as well as names are presumptively available to the public under the District of Massachusetts jury plan."). Second, that dicta did not specify what was meant by addresses, whether actual home addresses or simply city or town of residence.[6]

Longstanding Supreme Court precedent calls for a two-prong approach to deciding whether a First Amendment right of access to certain aspects of criminal proceedings attaches. First, courts are to consider "whether the place and process have historically been open to the press and general public." *Press-Enterprise Co. v. Superior Court of California for Riverside Cty.*, 478 U.S. 1, 8 (1986).[7] Second, courts should consider

---

[6] As I suggested in an earlier order on the same subject in *United States v. Cadden*, No. 14-cr-10363-1, Dkt #1134 (June 22, 2017), if the Court of Appeals truly meant home addresses, it may wish to reevaluate that decision in light of the sad history of the last quarter of a century – as I noted in my previous order, we live in a less innocent and more threatening age.

[7] For example, there is a consensus among courts that there is no right of public access to bench and lobby conferences held between the judge and lawyers in a criminal or civil case to discuss legal questions and

"whether public access plays a significant positive role in the functioning of the particular process in question." *Id.*

As to the first consideration, the example of the Boston Massacre trials is often cited as historical evidence supporting the argument that courts historically have made jurors' home addresses public. *See* Trustees' Mem. at 5, n.3 (Dkt #1246). The argument, however, does not hold up under examination. At the time of the Boston Massacre in 1770, "juries were Regulated by the Province Law, and the practice of the Courts had been, to order about 30 persons, sometimes a few more, to be returned to serve the whole term, and out of these two Juries were formed at the beginning of the Court, and the super numeraries were dismissed." 3 LEGAL PAPERS OF JOHN ADAMS 49 n.9. To populate the juries of the day, the court would send out a writ of *venire facias* to the surrounding towns which indicated the required number of veniremen to be summoned for jury service, and "each town in the county would, from a list previously prepared by the selectmen, draw as in a lottery the names of as many veniremen as the writ commanded. Thus Boston would send eighteen veniremen, Dorchester three, Braintree two, and so on." HILLER B. ZOBEL, THE BOSTON MASSACRE 243 (1970). Once jury

---

administrative matters. *See, e.g., United States v. Norris*, 780 F.2d 1207, 1210-1211 (5th Cir. 1986).

panels were selected and subdivided into groups of twelve, they would "hear[] all the civil cases in a given term" and "[t]he panel was then reassembled for criminal cases . . . . " NELSON, AMERICANIZATION OF THE COMMON LAW 21.[8]

Following the acquittal of Captain Thomas Preston, the commanding officer during the deadly confrontation between colonials and British troops on the evening of March 5, 1770, a jury venire was summoned for the trial of the soldiers who had fired the fatal volley. In the process of *voir dire*, the initial pool of veniremen produced so many disqualifications that the sheriff, as was standard practice at the time, began to seize random passersby and march them into the courthouse. ZOBEL, BOSTON MASSACRE 270. However, because these men "were mostly Bostonians, thus more likely to have nurtured disqualifying antimilitary prejudices, filling the last three juror

---

[8] A similar "panel" system was used at the Central Criminal Court of England and Wales in London (commonly referred to as Old Bailey). *See* John H. Langbein, *The Criminal Trial Before the Lawyers*, 45 U. CHICAGO L. REV. 263, 276 (1978) ("Not only did a single Old Bailey jury commonly try dozens of cases at a single sessions, but most of the dozen jurors who sat at any one session were veterans of other sessions."). Also, unlike today – where jury service is compulsory and widespread, with no property ownership or other qualifications – it was common at the Old Bailey for jurors to serve several times over the course of just a handful of years. *See id.* at 276 ("In a vast metropolis jurors were recurrently drawn from a miniscule cohort.").

seats seemed an impossible task"; ultimately "[n]ot one of the twelve men came from Boston." *Id. See also* ERIC HINDERAKER, BOSTON'S MASSACRE 192 (Belknap, 2017) ("None of the jurors was from Boston; five of the twelve had a strong bias in favor of the crown's interest, while no one was seated who can be identified with the town's leaders in their ongoing controversies with the crown.").

Although the legal papers of John Adams (the defense attorney for the soldiers) include the names and towns of residence of each juror who sat on the case, *see* 3 LEGAL PAPERS OF JOHN ADAMS 99-100, there is no support in the historical record for the assertion that the jurors' identities and dwelling locations were common knowledge throughout Boston (as none who served were Boston residents, nor did directories of names and addresses then exist). Samuel Adams, the prominent Son of Liberty and future Governor of Massachusetts, thought that the lack of Boston jurors was "intolerable" and a violation of the principle of jury trial by *vicinage*. ZOBEL, BOSTON MASSACRE at 271. However, "nobody took him seriously," *id.*, and "no notable public protest followed the verdicts. The jurors afterward went home . . . ."[9] NEIL

---

[9] While the jurors were spared execration for their verdict, the same was not true for the defense team of Adams and Josiah Quincy. According to Zobel's history of the Massacre and the trial: "Some of the townspeople violently disagreed that the verdict was correct. They heaped abuse on Adams and Quincy, [and] the lawyers heard their names execrated in the

YORK, THE BOSTON MASSACRE: A HISTORY, WITH DOCUMENTS 188 (Routledge, 2010).

The most that can be definitely concluded from the historical sources is that the public may well have had access to juror names and the towns in which they lived.  However, there is no mention of the inclusion of addresses, their trades or employers, or other identifying information.  In short, there is no evidence that jurors' home addresses "have historically been open to the press and general public."  *Press-Enterprise,* 478 U.S. at 8.

As for the second consideration – whether public access to the home addresses of jurors after their service is complete and they have returned to private life "plays a positive role in the functioning" of the jury system, *Press Enterprise*, 478 U.S. at 8 – I am of the view that it does not.  To the contrary, the realistic prospect that jurors will be sought out and harassed by individuals seeking to impugn the verdict reached in a particular case, including disgruntled litigants, lawyers, and mere troublemakers, serves only to deter citizens from a willingness to serve.  As Justice Cardozo wrote, there is a legitimate concern that "[f]reedom of debate might be stifled and

_____

most opprobrious terms whenever [they] appeared in the streets of Boston. 'To this hour,' Adams complained in 1815, 'my conduct in it is remembered, and is alleged against me to prove I am an enemy to my country, and always have been.'" ZOBEL, BOSTON MASSACRE at 302.

independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States,* 289 U.S. 1, 13, 16 (1933) (Cardozo, J.). Experience underscores Justice Cardozo's warning. *See Sheppard v. Maxwell*, 384 U.S. 333, 353 (1966) ("[T]he jurors [in the infamous *Sheppard* case] were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers. The numerous pictures of jurors, with their addresses, which appeared in the newspapers before and during the trial itself exposed them to expressions of opinion from both cranks and friends.").[10]

While the court respects the role of the press in covering trials of public concern, "the Constitution does not . . . require government to accord the

---

[10] One scholar has commented on the potential that post-verdict interviews and harassment may, at times, resemble the common law writ of attaint:

> Potential jurors are being taught that their deliberations will not be secret at all. They can expect to be interviewed. They will be asked for their reasons and those of their fellow jurors for convicting, acquitting, or being unable to agree. And when they return an unpopular verdict, the postverdict "inquisition" by the media can easily take on the quality of attaint at common law, figuratively punishing jurors for doing their duty.

Abraham Goldstein, *Jury Secrecy and the Media: The Problem of Postverdict Interviews*, 1993 U. Ill. L. Rev. 295, 296-297 (1993).

press special access to information not shared by members of the public generally." *Pell v. Procunier*, 417 U.S. 817, 834 (1974). In this case, concerns for juror privacy and a lack of precedent requiring the disclosure of jurors' home addresses lead the court to conclude that a release of jurors' names, together with their home towns, at the appropriate time (after sentencing), strikes the proper balance between the public right of access and the juror right to privacy.

After the verdict in the *Chin* case, the court explained to the jurors (as it does after all verdicts) that they were free to speak to the press if they chose to do so.[11] Nonetheless, because "jurors, even after completing their service, are entitled to privacy and to protection against harassment," *United States v. Harrison*, 713 F.2d 1114, 1116 (5th Cir. 1983), that decision is one that should, to the extent possible, be left in the jurors' hands. Consequently, the court rules that the Trustees are not entitled to the court's dissemination of the jurors' home addresses.

---

[11] The Trustees object that they need jurors' home addresses to contact them, because they have had difficulty in the past locating jurors without street addresses. *See* Trustees Mem. at 2. The court is not persuaded that these past difficulties trump the interests of both the individual jurors in their privacy, and the institutional interests in protecting the functioning of the jury system that the court has limned above.

## CONCLUSION

"The trial by jury is justly dear to the American people.  It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448 (1830) (Story, J.).  Although "[o]nly a shadow of this communitarian institution has survived into the urbanized America" of today, Alschuler & Deiss, *A Brief History of the Criminal Jury*, at 927, the court is committed to safeguarding the integrity of what remains.  The court would also suggest that any judge evaluating this same issue consider whether he or should would disclose his or her home address when issuing orders or rulings.[12]

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[12] This is not meant to be ironic.  The U.S. Marshals Service has informally told me, in my capacity as the former judicial chief of courthouse security, that hundreds of threats per year against judges are processed by the Marshals Service.  Some prove credible as was the tragic case not long ago in Chicago.