UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES OF AMERICA

v.

GLENN CHIN

MEMORANDUM AND ORDER
ON FORFEITURE OF PROPERTY

February 23, 2018

STEARNS, D.J.

Following Glenn Chin's conviction for mail-fraud racketeering, conspiracy, mail fraud, and violations of the federal Food, Drug, and Cosmetic Act (FDCA), the government sought the forfeiture of the entire $611,774 that Chin was paid in salary as a pharmacist at New England Compounding Center (NECC) between 2006 and October 2012, when NECC ceased doing business. *See* Dkt #1391 (Motion for Order of Forfeiture). Chin filed an opposition, *see* Dkt #1423, and the court heard oral argument on February 15, 2018.[1] For the reasons to be stated, the government's motion will be allowed in part.

---

[1] In that same hearing, the court heard argument on the government's Motion for an Order of Restitution. *See* Dkt # 1400. The question of restitution will be the subject of a separate Order.

The government is correct that a forfeiture in this case is virtually mandated by 18 U.S.C. § 1963. *See Alexander v. United States*, 509 U.S. 544, 562 (1993) (noting that "a RICO conviction subjects the violator not only to traditional, though stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963."). The court also agrees that Chin's salary, paid for his work as NECC's Supervisory Pharmacist during the period of time in which NECC was operating as a criminal enterprise, is forfeitable. *See United States v. DeFries*, 129 F.3d 1293, 1313 (D.C. Cir. 1997) (holding that salaries received by former union officials after their tampering with union elections were subject to forfeiture because "but for the elections, which the district court found to be tainted by appellants' racketeering activity, they would not have received their salaries."). Here, but for Chin's participation in conduct "tainted by . . . racketeering activity," he would not have earned the salary that he did from NECC. *See United States v. Angiulo*, 897 F.2d 1169, 1213 (1st Cir. 1990) (endorsing the "but for" test).

Where the court parts company with the government is over the proposition that NECC operated as a criminal enterprise from its inception, thus exposing the entirety of Chin's earnings from 2006 through 2012 (the statute of limitations period) to forfeiture. As I observed at Chin's sentencing (and at the sentencing of codefendant Barry Cadden), the weight of the

evidence, as corroborated by an analysis of the jury's verdict, is that NECC originated as a legitimate business, but under mounting pressure to maximize profits, degenerated into a criminal enterprise in March of 2010, and operated as such until its collapse in October of 2012.[2] Consequently, only the salary that Chin received during that period of time falls within the precincts of forfeitable gains.

According to the government's calculations, as corroborated by Chin's tax returns, the total of Chin's potential salary exposure can be calculated as follows. Chin earned $171,837 at NECC in 2011, and $163,805 during the ten months in 2012 during which NECC remained viable. Chin was paid $165,531 by NECC in 2010 (at a monthly salary of $13,794.25). Prorating 2010 over ten months from March to December yields $137,942.50. Combining the three figures ($137,942.50 + $171,837 + $163,805) yields a total of $ 473,584.50.

Chin advances three arguments in support of a lesser amount. The first, and most radical, is the contention that he should only forfeit the

---

[2] As I noted in a separate order, see Dkt # 1433, correcting a dating miscue on my part at Chin's sentencing hearing, "[a] RICO enterprise is defined by a minimum of two related predicate acts occurring within ten years of one another. Here, in Chin's case, as in the Cadden trial, the earliest predicate act found by the jury is the fraudulent mailing of March 25, 2010 (Predicate Act 69). All parties agree that the enterprise [thereafter] endured until the shuttering of NECC in October of 2012."

portion of his salary associated with the specific shipments of drugs the jury found to have been part of the mail fraud scheme. *See* Chin Opp'n, Dkt #1423 at 5 (arguing that "a reasonable method" of calculating forfeiture would be "to determine what percentage of NECC's gross revenues" during the racketeering period "was comprised of products that were tainted by the fraud proved at trial, and find the forfeiture amount to be the corresponding percentage of Mr. Chin's compensation for that period.").

There are legal, as well as conceptual difficulties, with this argument. As the government points out, 18 U.S.C. § 1963(a)(3) provides for the forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity." In Chin's case, the entire salary he earned at NECC during the relevant time period constitutes "proceeds . . . obtained, directly or *indirectly*" from his participation in the racketeering enterprise. Moreover, as a practical matter, there is no realistic means of calculating the actual value added by Chin to any specific batch of drugs shipped by NECC.

Chin's second argument is that his gross salary is an improper starting point for any calculation of a forfeitable amount because it includes payments for federal and state taxes, as well as other benefits, that were deducted from his paycheck. The government counters (accurately) that

4

First Circuit precedent generally holds that forfeitable proceeds in a RICO context are to be measured in gross, rather than net, terms. *See, e.g., United States v. Hurley*, 63 F.3d 1, 21 (1st Cir. 1995) (rejecting defendant's argument that "proceeds" means "net proceeds" or "net profits" under § 1963 (a)(3)). This precedent is consistent with Congress's intention that RICO's forfeiture provisions be "broadly interpreted." *Id.*

The "gross proceeds" approach is further supported by the obvious difficulty involved in calculating "business expenses" in the mine run of RICO cases, in which the enterprise is constituted from the outset as an illegal entity for which, deliberately, no accurate records are kept in order to conceal the underlying activity from law enforcement. NECC, however, is an exception. The company was not initially constituted as an illegal enterprise, and it kept detailed and accurate records during its corporate existence. Consequently, it is no difficult matter to segregate the portion of Chin's salary that was deducted for federal and state taxes, health benefits and retirement accounts. Not surprisingly, there is support in circuit case law for using a net approach where the relevant figures are readily ascertainable. *See United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003).

A recent Supreme Court recent ruling, *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), offers important guidance. *Honeycutt* stands for the

proposition that a RICO forfeiture is to be "limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635. As the government points out, *Honeycutt* makes clear that property "received" can include benefits obtained "indirectly" from a RICO enterprise. *See* Gov't's Reply, Dkt # 1432 at 5 ("For example, if a criminal participated in a fraud scheme and the victim paid the criminal's mortgage or car loan for him, the value of that payment would be ill-gotten gains that the criminal obtained indirectly."). Consistent with this reasoning, the portions of Chin's salary that were deducted to cover health care benefit payments and retirement account contributions constitute property "obtained" indirectly by Chin because he was their ultimate beneficiary.

The money deducted from Chin's salary as federal income tax payments do not, however, fit within this analysis. The counter-argument, made by government counsel at the forfeiture hearing, that the federal tax deductions were paid for Chin's "benefit" (presumably because in a larger sense he and his family were recipients of government services), is not one that most taxpayers, however zealous in their filings, would find compelling. While there may be a flush of civic pride in paying taxes, it is difficult to see how money paid into the U.S. Treasury can be characterized as proceeds "obtained" by a defendant. There is also a double counting issue arising from

the fact that forfeited proceeds escheat to the Treasury, meaning that Chin is being asked, in effect, to pay his taxes twice.[3] These two considerations lead me to conclude that Chin's federal income tax payments should be deducted from the forfeiture figure.[4]

According to Chin's tax returns, his tax bracket varied between 25% and 28% during the tax years in question. The court will use the mean of 26.5% as an appropriate estimate for Chin's effective tax rate during this period. This results in an adjusted, post-federal tax figure of $473,584.50 minus $125,499.90[5], or $348,084.60.

Chin's third argument is constitutional. He contends that the forfeiture of his entire earnings during the relevant period would violate the

---

[3] I take the government at its word that the Department of Justice, to the extent that it has the authority to do so, intends to pay over any forfeiture proceeds to patients and families who suffered from the contaminated drugs (essentially converting the forfeiture into a restitution payment). While commendable, this does not address the double counting issue as all Treasury monies are fungible.

[4] This is not, however, the case with respect to state and local taxes, as the governmental entities involved are not asserting an interest in this case, and will not receive any of the forfeited funds.

[5] The specific calculations are as follows:

$137,942.50 (2010 salary, March-Dec) x .265 = $36,554.76
$171,837 (2011 salary) x .265 = $45,536.81
$163,805 (2012 salary, until Oct. 31) x .265 = $43,408.33
Total: $125,499.90

7

Excessive Fines Clause of the Eighth Amendment.[6] "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). In evaluating whether a financial penalty is so oppressive as to violate the Eighth Amendment, courts begin by applying a three-factor test: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005).

The three-factor test weighs heavily in favor of the government. With respect to the first factor, Chin argues that he is "far from fitting the archetypal profile of an organized crime figure or a calculating predator who chooses to enter into a conspiracy for the very purpose of perpetuating fraud, who are the classes of persons at whom the [RICO and RICO forfeiture] statutes were principally directed." Chin Opp'n, Dkt #1423 at 10. While in the popular imagination, RICO conjures up images of mobsters engaged in

---

[6] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

loansharking, extortion, and illegal gambling, Congress intended "that RICO (although a criminal statute) be broadly interpreted." *Hurley,* 63 F.3d at 21. The best evidence of this is the inclusion of mail fraud, which is hardly one of the usual tools of the gangster trade, as one of the predicate acts on which a RICO enterprise can be based.

As for the second factor, Chin cites the Probation Office's Presentence Report (PSR) and its recommendation of a "fine range" of $20,000 to $200,000. *See* PSR ¶ 167. Because that recommended range is significantly lower than the forfeiture amount that the government seeks, Chin argues that the proposed forfeiture is "out of line" with the financial penalty endorsed by the U.S. Sentencing Commission. While this argument has some value in considering whether a hardship reduction in the forfeiture amount is appropriate, for purposes of the second *Heldeman* factor, it is not persuasive. The statutorily authorized maximum fine is $250,000 on each of the 41 mail fraud counts alone for which Chin was convicted. In other words, Congress has authorized a total fine far in excess of what the government is seeking through forfeiture.[7]

---

[7] The government reads Chin's argument as suggesting that the forfeiture should be keyed to the loss amount calculated by the court at sentencing pursuant to USSG § 2B1.1. The government points out that the court rejected a similar argument in the Cadden proceedings, because the argument "confuses loss for purposes of the sentencing guidelines, which

9

Finally, Chin argues that, because the court has found that the "victims" of NECC for loss calculation purposes under the Sentencing Guidelines were the clinics and hospitals that relied on fraudulent representations in purchasing NECC's drugs, the "harm" caused by Chin's conduct should be evaluated by the same measure. I am not persuaded. While the hospitals and clinics were the immediate victims of the mail fraud, the harm caused by the fraudulent scheme impacted the thousands of patients who were injected with the contaminated drugs (or feared as much), as well as their families and loved ones. Evidence introduced at trial, including internal NECC emails, brought home the certainty that Chin and other of the co-conspirators were fully aware of the risks involved in the distribution of defective drugs. In sum, the *Heldeman* factors militate in favor of the government.

Nonetheless, as the First Circuit has made clear, "the three-part test for gross disproportionality described in *Heldeman . . .* is not the end of the inquiry under the Excessive Fines Clause." *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008). In addition to the proportionality test, "a court

---

focuses on loss to victims, with criminal forfeiture, which is aimed at a defendant's ill-begotten gains from criminal activity." *See United States v. Barry Cadden,* 14-cr-10363-1-RGS, Mem. and Order on Forfeiture of Property, Dkt #1216 at 5 n.8 (Sept. 27, 2017). That is true here as well.

should also consider whether forfeiture would deprive the defendant of his or her livelihood." *Id.* The source of this concern derives from the singular and ancient history of the Eighth Amendment. *Id.; see also United States v. Jose*, 499 F.3d 105, 113 (1st Cir. 2007).

The text of the Excessive Fines Clause was taken, almost verbatim, from the Virginia Declaration of Rights of 1776.[8] That text, in turn, had been copied from the English Bill of Rights promulgated in 1689 during the Glorious Revolution. Many of the drafters of the English Bill of Rights had themselves been victims of arbitrary and excessive punishment during the reign of the dethroned James II, with some having had "to remain in prison because they could not pay the huge monetary penalties that had been assessed." *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 267 (1989).

Among the complaints leveled by the Revolutionaries against the King's Bench was that it had "subvert[ed] the requirement, under Magna

---

[8] Earlier efforts in the colonies to codify individual rights and liberties and to establish roadmaps for governance had also included a prohibition on excessive fines. For instance, the 1682 Frame of Government of Pennsylvania provided "[t]hat all fines shall be moderate, and saving men's contenements, merchandise, or wainage." *See* Frame of Government of Pennsylvania, May 5, 1682, *available* from The Avalon Project, Yale Law School, http://avalon.law.yale.edu/17th_century/pa04.asp

[Carta], that 'amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood.'" *Levesque*, 546 F.3d at 84 (quoting *Bajakajian*, 524 U.S. at 335).[9] Chapter 14 of Magna Carta had provided that:

> A Freeman shall not be amerced for a small Fault, but after the Manner of the Fault. And for a great Fault, after the Greatness thereof, saving to him his Contenement. (2.) And a Merchant likewise, saving to him his Merchandize. (3.) And any others Villain than ours shall be likewise amerced, saving his *Wainage*, if he fall into our Mercy.

A man's contenement was "Freehold land held by a feudal tenant," in particular "land used to support the tenant." Black's Law Dictionary (10th ed.); *see also* Calvin R. Massey, *The Excessive Fines Clause and Punitive Damages: Some Lessons from History*, 40 VAND. L. REV. 1233, 1260 n.154 (1987) (citing historical sources defining Contenement as "that which is necessary for his support, according to his Condition or State of Life; so that tho' he might be amerced, yet something must be left for his Support."). The wainage, or wainagium, generally referred to the "instruments of

---

[9] During the time that followed the Norman Conquest, a new system emerged whereby "individuals who had engaged in conduct offensive to the Crown placed themselves 'in the king's mercy' so as not to have to satisfy all the monetary claims against them," and "[i]n order to receive clemency, these individuals were required to pay an 'amercement' to the crown, its representative, or a feudal lord." *Browning-Ferris*, 492 U.S. at 287-88 (O'Connor, J., concurring in part and dissenting in part).

12

husbandry," or "the plow, team, and other implements used by a person to cultivate the soil," Black's Law Dictionary (10th ed.), the feudal analog to what we might refer to today as a person's livelihood.[10] These safeguards were a significant improvement on more ancient notions of punishment that provided for directly proportional retaliation against the accused depending on the severity of the crime. *See* Leviticus 24:19-20 (King James Version) ("And if a man cause a blemish in his neighbour; as he hath done, so shall it be done to him; Breach for breach, eye for eye, tooth for tooth: as he hath caused a blemish in a man, so shall it be done to him again.")

As the Supreme Court has noted, "[a]lthough the Framers may have intended the Eighth Amendment to go beyond the scope of its English counterpart, their use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection — including the right to be free from excessive punishments." *Solem v. Helm*, 463 U.S. 277, 286 (1983). The Eighth Amendment thus incorporated

---

[10] Lord Coke described the origins of the wainagium as deriving from the Saxon word "wagna," which was a cart or wagon used by an indentured servant to carry manure from the lord's manor to his fields. *See* 2 E. Coke, The Institutes of the Laws of England *28 (noting that in rendering his service to the lord, the villain used a cart (or wain) to carry the dung "out of the seite of the manor unto the great lord's land, and casting it upon the same, and the like; and it was great reason to save his wainage, for otherwise the miserable creature was to carry it on his back.").

into American domestic law the English common-law principle that amercements or fines are not to be livelihood-shattering.[11]

Against this background, Chin argues that a forfeiture order "of any substantial sum" will deprive him of his future ability to earn a living, "especially if 'earning a living' is interpreted to mean contributing in a meaningful way to the support of his two children who will still be minors wholly dependent on their parents for financial support when Mr. Chin is released from prison." Chin Opp'n, Dkt #1423 at 13. Having surrendered his pharmacy license in the fall of 2012, and with no prospect of it ever being reinstated, Chin argues that he has "no reasonable expectation that he will ever again earn a professional-level income." *Id.* In addition to his young children, Chin notes that his wife, Kathy Chin, who is scheduled to go on trial for her alleged role in the NECC conspiracy later this year, has no realistic

---

[11] Magna Carta also established a mechanism for challenging an amercement as excessive, in the form of a writ of *de moderata misericordia capienda* ("for taking a moderate amercement"), which "order[ed] a bailiff to take a moderate penalty from a party had been excessively penalized in a court not of record." Black's Law Dictionary (10th ed.) Early English practice under the writ confirms that proportionality of the monetary penalty to the crime committed and the question of whether the amerced party's livelihood would be destroyed were analytically distinct questions (as the First Circuit recognized in *Levesque*). *See* Massey at 1259-60 ("If the amercement was not tainted by such disproportionality, but was still so large so as to infringe upon a person's means of earning a living or maintaining himself and his family, *misericordia* would still lie.").

means of making up his contribution to his family's finances. Chin also points to the fact that the government is seeking $82 million in restitution, suggesting that the court take that into account in determining the appropriate forfeiture amount.[12] Finally, Chin contends that "he has no substantial assets with which to satisfy any forfeiture order, and no reasonable prospect of accumulating any such assets." *Id.*

As the First Circuit observed in *Levesque*, a present inability to pay is not dispositive on the question of whether a forfeiture is unconstitutional:

> Although we do not define the contours of this inquiry, we note that a defendant's inability to satisfy a forfeiture at the time of conviction, in and of itself, is not at all sufficient to render a forfeiture unconstitutional, nor is it even the correct inquiry. Indeed, the purpose of imposing a forfeiture as a money judgment is to "permit[] the government to collect on the forfeiture order in the same way that a successful plaintiff collects a money judgment from a civil defendant. Thus, even if the defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order.

---

[12] *But see United States v. Mei Juan Zhang*, 789 F.3d 214, 218 (1st Cir. 2015) (joining a unanimous holding among the federal circuit courts that restitution and forfeiture are not impermissible double penalties and that a district court is "without authority to offset the restitution . . . owed by the amount seized [in forfeiture]."). As in the Cadden case, I read the relevant precedents and the respective histories of both the RICO forfeiture statute and the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A(a)(1), as requiring that a court evaluate forfeiture and restitution separately.

546 F.3d at 85 (internal citation omitted). At oral argument, the government doubled down on this dicta, noting that Chin could come into funds later, or could possibly "win the lottery." However, while accepting the principle that current inability to pay *vel non* (leaving aside the random chances of a win in a mega-lottery[13]) should not dictate the constitutionality of a forfeiture order under the Eighth Amendment, it does not lose all relevance in Chin's case. The court is sensitive to the fact that Chin has no educational or vocational training outside of the pharmacy trade (which is now foreclosed to him) and that his two young children will bear a substantial part of the burden imposed by his imprisonment and impoverishment.[14]

The government makes a salient point in rebuttal, noting that the Chins (the defendant and his wife) have spent a significant sum of money (nearly $700,000) over the past sixteen months, including the purchase of a new motor vehicle, paying off their mortgage, investing in businesses that

---

[13] *Cf. People v. St. Martin*, 1 Cal.3d 524, 533 (1970) ("Our courts are not gambling halls but forums for the discovery of truth.").

[14] This observation is not meant in any sense to detract from the far more weighty burden imposed on the victims of NECC's malfeasances. The court also fully understands that it is unlikely that many, if any, of these victims will have any sympathy for Mr. Chin's circumstances. The court, however, is bound to treat Mr. Chin according to the law and with the recognition that, however careless his acts, he would never have deliberately set out to inflict the harms to which they so tragically contributed.

Kathy Chin has launched to generate a source of income for the family, and on gym memberships, piano classes for the children, travel, groceries, clothing, Florida time shares, and support for extended family members in China. While the inference is that the Chins were engaged in a deliberate effort to spend down their assets (over and above payments for family necessities) to avoid paying a fine or forfeiture, the court notes that they there were under no legal obligation to preserve their assets to satisfy a future judgment. More troubling is the suggestion, now being examined by the Magistrate Judge, that Mr. Chin may have misrepresented his net worth to avoid contributing to the payment for the services of the lawyers appointed by the court to represent him.

Balancing this latter concern against the Eighth Amendment command that that any forfeiture not destroy the future ability of a defendant to earn a living in support of his family, the constitutional imperative necessarily takes precedence.[15] On balance, taking into account Chin's current financial situation[16], his bleak prospects of ever earning a

---

[15] It is worth noting that a forfeiture judgment is not, as a rule, dischargeable in bankruptcy, but will follow Chin after he is released from prison.

[16] As best I can determine from the verified statement filed by Chin with the court, he and his wife have a current net worth of approximately $423,000 with monthly expenses of roughly $12,000.

17

professional-level income again, and his family support obligations, the court believes that a forfeiture of $175,000, a sum towards the upper end of the Sentencing Guidelines fine range, is sufficiently punitive, while stopping short of depriving Chin and his family of "that which is necessary for his support, according to his Condition or State of Life."[17]

ORDER

For the foregoing reasons, the court <u>ORDERS</u> Glenn Chin to forfeit assets in the amount $175,000. The government is directed to file, within 10 days of this order, a revised proposed order of forfeiture consistent with this decision.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[17] The court would have been inclined to impose a lesser sum, but for the efforts made by Mr. Chin to rearrange his assets as he faced trial. In this regard, the court notes that some of the acquisitions (the car, home equity, and the time shares, as examples), continue to form part of the family's net worth.